IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| VERA M. JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. CIV-04-1268-HE |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner, Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Vera M. Jackson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405 (g) seeking judicial review of the Defendant Commissioner's final decision denying Plaintiff's applications for disability insurance benefits and supplemental security income payments under the Social Security Act. This matter has been referred to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Upon review of the pleadings, the record ("Tr.") and the parties' briefs, the undersigned recommends that the Commissioner's decision be affirmed.

**Administrative Proceedings**

Plaintiff initiated these proceedings in October, 2002, by filing claims for disability insurance benefits and supplemental security income payments, alleging that she became disabled as of April 15, 1999[1] as a result of back pain, leg pain, asthma, breathing difficulties and diverticulitis [Tr. 53, 54 - 56, 64, 168, and 169 - 172]. Plaintiff's claims were denied; she subsequently sought and received a de novo hearing before an

---

[1] At the administrative hearing, Plaintiff's counsel amended the claimed onset date to January 31, 2000 [Tr. 193].

administrative law judge ("ALJ") who heard testimony from Plaintiff and a vocational expert [Tr. 29 - 31, 33 - 34, 35, 174 - 176, 178 - 180, and 190 - 248]. After his April, 2004 hearing decision, the ALJ found that Plaintiff could perform various jobs which were available in significant numbers in the national economy and, consequently, was not disabled within the meaning of the Social Security Act [Tr. 14 - 24]. The Appeals Council of the Social Security Administration declined Plaintiff's request for review, and Plaintiff subsequently sought review of the Commissioner's final decision in this court [Tr. 5 - 8].

**Standard of Review**

This court is limited in its review of the Commissioner's final decision to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). However, while this court can neither reweigh the evidence nor substitute its own judgment for that of the ALJ, the court's review is far from superficial. "To find that the [Commissioner's] decision is supported by substantial evidence, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* at 299.

**Determination of Disability**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. §§404.1520(b)-(f), 416.920(b)-(f) (2000); *see also Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir. 1988) (describing five steps in detail). Plaintiff bears the initial burden of proving that she has one or more severe impairments. 20 C.F.R. §§ 404.1512, 416.912 (2000); *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). Where Plaintiff makes a prima facie showing that she can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show that Plaintiff retains the capacity to perform a different type of work and that such a specific type of job exists in the national economy. *Turner*, 754 F.2d at 328; *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984). In this case, the ALJ determined that Plaintiff could not perform her past work and continued the analysis through the fifth step of the sequential process.

**Plaintiff's Claim of Error**

Plaintiff claims that the ALJ's residual functional capacity ("RFC") assessment, that is, his assessment of work which Plaintiff could still perform despite her limitations, was deficient because it did not include limitations relating to Plaintiff's alleged need for periodic unscheduled administration of medication, i.e., Plaintiff's alleged need to use

a nebulizer[2] at unscheduled times during the workday. Plaintiff asserts that "[i]n making his determination, the ALJ ignored claimant's testimony and the consultative examination of claimant's pulmonary functioning." [Doc. No. 14, Vera M. Jackson's Brief and Statement of Position With Authorities, page 5].

Because Plaintiff's claim of error relates only to her breathing difficulties arising from chronic obstructive pulmonary disease ("COPD") – an impairment which the ALJ found to be severe [Tr. 17] – the following review of the ALJ's decision will encompass the issues relating to that impairment and to Plaintiff's credibility and will not include the ALJ's unrelated findings, including medical findings with respect to Plaintiff's disorder of the muscle and ligaments of the spine.

**The ALJ's Decision**

The ALJ began his decision with a lengthy discussion of Plaintiff's lack of credibility [Tr. 15]. Plaintiff – forty-seven years old with a tenth grade education and with past work experience as a certified nurse's aide and newspaper carrier/deliverer/driver – testified that she began using a nebulizer for her asthma problems in January or February of 2000, on orders of Martin Kubier, P.A. ("PA"), Plaintiff's treating health care provider [Tr. 197 - 198]. Plaintiff testified that she was told to use the device three times a day at a minimum and more as needed and concluded that she used the nebulizer four or five times per day, with each breathing treatment lasting twenty to twenty-five minutes [Tr. 15 and 198 - 200]. She then changed her testimony,

---

[2]A nebulizer is "an atomizer; a device for throwing a spray." *See Dorland's Illustrated Medical Dictionary,* p. 1100 (27th Ed. 1988). The device, which is powered by a compressed air machine, allows medications to be taken in the form of a mist. *See* http://www.medox.org/nebulizer.htm.

stating that she uses the nebulizer once in the morning, once before bedtime and three or four times from 8:00 a.m. until 5:00 p.m. *Id.* Plaintiff also testified that her back problems began when she was working as a nurse's aide [Tr. 15 and 203]. She stated that her back pain usually results from "little things that I do like sweeping or doing the dishes, walking, shopping [at the] grocery store." [Tr. 15 and 205]. According to Plaintiff's testimony, the pain comes and goes, and she is pain-free when she is lying down [Tr. 15 and 204].[3] She lies down two or three times a day [Tr. 15 and 213]. Plaintiff stated that lifting is difficult because of carpal tunnel syndrome, a condition for which she has not sought treatment for some time [ Tr. 15 and 214 - 215]. Her left leg hurts, with pain at the top of the leg and in the left hip area [Tr. 15 and 207 - 208]. Plaintiff stated she loses her balance; she has occasional muscle spasms in her legs, and she also has swelling but does not know why this occurs [Tr. 15, 207 and 209 - 211].

In further testimony, Plaintiff stated that her husband helps her "with . . . everything that I do"[4] [Tr. 15 and 222 - 223]; she and her husband live in the country on 2.2 acres and keep cats, dogs, cows, chickens, a goat, ducks and guineas [Tr. 15 and 217 - 219]; she does not work in the yard or garden or feed the animals as her husband does that [Tr. 15, 218 and 220 - 221]; she mainly stays at home with her husband, although he goes to town, but she does go out to eat with her husband [Tr. 15, 219 - 220 and 221];

---

[3]Shortly after testifying that she was free of pain when lying down, Plaintiff altered her testimony:
Q    Okay. Lying down doesn't seem to bother you. That kind of helps the situation, doesn't it?
A    Sort - - sometimes, sometimes it hurts when I lay down too but - -
[Tr. 206].

[4]Plaintiff also stated during the course of her testimony that her husband is disabled [Tr. 231 - 232]. Her application for Supplemental Security Income confirms that her husband is disabled and receives monthly Social Security payments [Tr. 169 - 171].

she normally gets up at 6:30 or 7:00, uses her nebulizer, has breakfast which she and her husband prepare [Tr. 15 and 222 - 223]; Plaintiff then wakes her four-year-old granddaughter who lives with Plaintiff and her husband and for whose care she is responsible, and combs the child's hair and helps her get dressed [Tr. 15 and 223 - 225], and she visits her doctor two or three times a month or more [Tr. 15 and 227].

The ALJ continued by noting that when Plaintiff applied for disability benefits, she completed several questionnaires, including a "Disability Supplemental Interview Outline." [Tr. 15 and 81 - 86].  There, Plaintiff reported that she was living with her husband, son and two grandchildren; that she was able to clean her home, but it took longer than it used to, and she needed help; she was still able to shop and cook, but she needed help; she did not specify the type of help needed or why it was needed; she reported difficulty with shopping because walking hurt her legs; performing household chores hurt her back and legs; she watched television for two to three hours a day; she was able to drive short distances, and she hurt with everything she did. *Id.*

The ALJ then observed that Plaintiff subsequently completed another "Disability Supplemental Interview Outline" in which she contradicted responses she made in the prior form [Tr. 15 and 93 - 98]. As an example, the ALJ mentioned that Plaintiff reported in the first filing that she read to her grandchildren [Tr. 15 and 84] but, in the more current form, she responded that she did not read at all due to her inability to see small letters [Tr. 15 and 96]. Moreover, Plaintiff acknowledged in the first form that she did some household chores [Tr. 15 and 82 - 83] but stated in the more recent interview form that she did no household chores and that her husband and daughter-in-law did

6

everything [Tr. 15 and 94 - 95]. The ALJ continued his explanation regarding Plaintiff's lack of credibility:

> There are other differences in the manner in which the claimant completed the forms. The claimant completed the more recent of the two forms in such a way as to indicate that she requires assistance with all personal care tasks, she does no housework, she does not visit or shop, she does not drive, and basically that she does nothing during the day. The treatment records submitted by the claimant however, do not show any corresponding worsening or new medical conditions which would cause such drastic deterioration in her condition as to have rendered her a complete invalid between November 2002, when she completed the first form, and June 2003, when she completed the second form. The medical evidence will be discussed below. The changes and inconsistencies in the claimant's statements, in the absence of any objective evidence of a worsening of her condition, indicate that her testimony and statements with regard to the severity of her conditions and functional restrictions are less than fully credible.

[Tr. 15 - 16].

In discussing the medical evidence of record, the ALJ stated that Plaintiff underwent a physical examination on September 11, 2002, at the Medical Center of Stratford [Tr. 18 and 108 - 109]. The examination was conducted by Plaintiff's treating PA and was in connection with Plaintiff's application to be a foster parent. *Id.* The PA reported that he had known Plaintiff professionally for five years and that she was healthy; that she took no medications; that she had no condition which would impair her ability to care for children, and her blood pressure was recorded as normal [Tr. 109]. The ALJ determined that "[t]he treating physician's opinion that she has no impairment causing condition and is healthy is consistent with the progress notes from that clinic, and is probative of the claimant's state of health and is inconsistent with her claim that she has been disabled since April 15, 1999." [Tr. 18].

7

A consultative physical examination of Plaintiff was conducted at the request of the Social Security Administration on February 14, 2003 [Tr. 18 and 120 - 126]. In connection with Plaintiff's chronic obstructive pulmonary disease, Plaintiff reported to the examining physician that she used Albuterol and Advair for her breathing problems and admitted that she continued to smoke [Tr. 18 and 120]. Physical examination revealed a few expiratory wheezes in the right lung base, but fairly good air movement [Tr. 18 and 121].

The ALJ concluded that the medical records failed to show any serious problems caused by Plaintiff's COPD [Tr. 19]. She had not required emergency medical intervention, she did not use oxygen, and she did not have frequent upper respiratory infections. *Id.* The ALJ then evaluated the results of pulmonary function studies performed on February 14, 2003, and determined that they did not meet listing level criteria. *See* C.F.R., Part 404, Subpart P, Appendix 1, Listings 3.02A and 3.02B.

The ALJ then returned to his assessment of Plaintiff's credibility, finding that Plaintiff's statements were not considered entirely credible because they were not consistent with her reports to her treating PA [Tr. 19]. As an example, the ALJ pointed to Plaintiff's report to her PA that her back pain was caused by mopping and sweeping. She was advised not to perform these activities. Her testimony, on the other hand, was that her pain was so constant and severe that she was prevented from performing most household chores and all yard work. *Id.* When she applied to become a foster parent, her PA described her as healthy and without any medical condition which would limit her ability to care for a child [Tr. 19 - 20 and 109]. The ALJ then stated, bluntly, in a

credibility assessment which has not been challenged by Plaintiff in her request for judicial review:

> In other words, the claimant, in pursuit of income, will say what is needed with regard to her symptoms. Her statements are therefore considered to be tainted by the prospect of financial gain and not entirely credible.

[Tr. 20].

The ALJ continued his evaluation of Plaintiff's credibility by finding that only minimal and conservative treatment for pain had been implemented by the treating PA; he had not referred her for further evaluation or for management of debilitating chronic pain. *Id.* Plaintiff's PA considered her to be "healthy." *Id.* In this same vein, the ALJ found that Plaintiff's testimony with regard to use a nebulizer three to five times per day was not supported by any of the medical records, records which did not include the PA's prescription for a nebulizer. *Id.*

The ALJ ultimately concluded that Plaintiff retained the RFC to perform a significant range of sedentary work but would be restricted from working around dust or fumes due to her pulmonary impairment [Tr. 20 - 21]. As none of her past relevant work was performed at the sedentary exertional level, the ALJ found that Plaintiff could not return to any of her past relevant work [Tr. 21]. Based upon the testimony of the VE, the ALJ determined that Plaintiff could perform the semi-skilled positions of timekeeper and check cashier and the unskilled position of cashier II [Tr. 22]. Consequently, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act [Tr. 22 - 23].

**The RFC Determination**

The argument portion of Plaintiff's brief is not divided into distinct topics but is written, instead, in a continuous narrative; the undersigned will address Plaintiff's various contentions as they appear in that narrative statement. Plaintiff begins her argument with the contention that the ALJ's RFC assessment was deficient because he failed to include limitations relating to Plaintiff's need for periodic unscheduled administration of medication, claiming that the ALJ ignored Plaintiff's testimony as well as "the consultative examination of claimant's pulmonary functioning." [Doc. No 14, page 5]. Plaintiff then discusses the results of the pulmonary function tests which the ALJ found did not meet the criteria of the applicable listings [Doc. No. 14, page 6; Tr. 19]. Plaintiff does not suggest that the ALJ erred in this determination but argues, instead, that "[w]hile no longer nearly equaling a listing, these values still demonstrate a serious condition with relation to Claimant's breathing." [Doc. No. 14, page 6]. Plaintiff then acknowledges that the ALJ did address limitations arising from Plaintiff's COPD in the RFC, but argues that he ignored the fact that Plaintiff was required to use her nebulizer at least three times daily in order to treat her COPD [Doc. No. 14, pages 6 - 7]. On the very next page of her brief, however, "[Plaintiff] admits the record makes no mention of how often she is to use the nebulizer, however, as stated in claimant's testimony, she was told to use it 3 times a day or more as needed."

With respect to Plaintiff's testimony regarding the number of times during the day she was allegedly required to use the nebulizer, Plaintiff takes issue with the ALJ's statement that the record does not reflect that Plaintiff's treating health care provider prescribed the nebulizer [Doc. No. 14, page 7]. Plaintiff does not point to any

10

documentation reflecting the original order for a nebulizer but relies, instead, on Plaintiff's hearing testimony that the nebulizer had been prescribed in January, 2000. *Id.* Plaintiff argues that because none of the medical records in the administrative record predate November 15, 2001, in keeping with his responsibility to adequately develop the record, "[i]f the ALJ was concerned about records prior to that date, he should have requested them." *Id.*

The undersigned has reviewed the medical evidence of record and has found no actual prescription for a nebulizer and no reference to a nebulizer at all prior to sometime in 2002. In fact, the PA's treatment note dated October 15, 2001, indicated that Plaintiff's lungs were clear [Tr. 116]. Beginning in January, 2002, a slight wheeze was noted and reference was made to asthma medication[5] and the need for "spiro," presumably spirometer[6], testing [Tr. 115]. In a document on which only the date "8-02" can be read but is cut-off making it unclear whether the "8" reflects the month or the day of the month, a nebulizer is mentioned for the first time [Tr. 114]. A nebulizer was not mentioned again until November 1, 2002 [Tr. 107]. That Plaintiff did not begin using a nebulizer until 2002 is consistent with her disability filings where she stated that she was given a breathing test in February, 2002 [Tr. 69] and was first prescribed with an Albuterol solution on February 29, 2002 [Tr. 88]. Not only do these documents

---

[5]"Drugs containing albuterol are prescribed for the prevention and relief of bronchial spasms that narrow the airway. This especially applies to the treatment of asthma." *See* http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/pro1360.shtml.

[6]A spirometer is "an instrument for measuring the air taken into and exhaled from the lungs." *See Dorland's Illustrated Medical Dictionary,* p. 1563 (27th Ed. 1988).

11

demonstrate that the ALJ had access to Plaintiff's medical records from the pertinent time period but they are also plainly inconsistent with Plaintiff's testimony at the administrative hearing that she began nebulizer treatment in January or February of 2000 [Tr. 197 - 198].

Plaintiff's argument continues with the contention that, "Therefore contrary to the assertions of the ALJ, Claimant is being treated with a nebulizer under the supervison of her treating physician." [Doc. No.14, page 7]. The ALJ made no such assertion but, instead, declined to accept Plaintiff's testimony – testimony which he found to lack credibility and support in the medical record – that she was supposed to use her nebulizer up to four times during the course of a work day on an unscheduled basis, thus impacting her ability to meet the demands of a job. Plaintiff again advances the argument that if the ALJ had "wished for clarification, he had access to claimant's other records from [her health care providers] and could have contacted them regarding the missing records." [Doc. No. 14, page 8]. Once again, the ALJ had access to all pertinent medical records from the time Plaintiff began her nebulizer treatments.

Equally unavailing is Plaintiff's argument that the ALJ erroneously found that medical records submitted by Plaintiff were not from an acceptable source because they were signed by a PA[7] [Doc. No. 14, page 8]. Even if as Plaintiff suggests – without giving the court the benefit of citation to the record – some of the documents were co-signed by a physician, the records the ALJ was referencing as reflecting the opinions of Plaintiff's

---

[7]A physicians' assistant is not an acceptable medical source. *See* 20 C.F.R. §§ 404.1513 and 416.913.

PA relate to a possible mental impairment – not a subject of this judicial review – and not to her nebulizer treatment [Tr. 20].

Finally, Plaintiff contends that, "The ALJ fails to adequately explain why he disregarded claimant's testimony[8] that she must use the nebulizer at least once during the workday." [Doc. No. 14, pages 8 - 9]. Plaintiff is essentially arguing that even if her testimony about the number of times she had to use her nebulizer was not always consistent, she was at least consistent in maintaining that she used it three times a day, once in the morning, once before bedtime and at least once, <u>as needed</u>, during the day [Doc. No. 14, pages 8 - 9]. Plaintiff's argument here is premised on a hypothetical question posed to the vocational expert by Plaintiff's counsel:

Q    If we've got a hypothetical lady of this young lady's age, education, and work experience. She's capable of doing sedentary work. Sit or stand option. But she must absent herself from the job, let's say one time daily, unscheduled times for up to forty minutes. Would there, without accommodation, would there be any jobs that would allow that?

A    Some jobs may allow for it. The unskilled, some unskilled jobs may allow for it. Since it's unscheduled - -

Q    Right.

A    - - it could likely fall within a lunch hour or after hour - -

Q    Well, what I'm talking about is as needed unscheduled. I'm not saying that - -

A    I see - -

---

[8]It is worth repeating that Plaintiff has not challenged the ALJ's credibility findings with legal argument and authority.

ALJ    Unpredictable onset.

ATTY  Unpredictable onset.

VE     Um-hum.

ALJ    In other words, may occur during the periods of scheduled work activity or normal work activity.

VE     Well, no, it couldn't be tolerated with, or compatible with the unskilled workday.

ALJ    In other words, if this occurred out of normal break times then these jobs would not be performable, is that - -

VE     That's - -

ALJ    - - correct?

VE     - - correct, yeah.

[Tr. 245 - 246]. Based on this testimony, Plaintiff contends that "it is the VE's opinion that claimant is not capable of performing other work that exists in the national economy." [Doc. No. 14, page 9].

Not only has Plaintiff previously admitted in her brief that "the record makes no mention of how often she is to use the nebulizer" [Doc. No. 14, page 8], but as is clear from the foregoing testimony, it was Plaintiff's counsel who raised the notion of a breathing treatment being on an "as needed" or "unscheduled" basis during the workday. There is simply no credible evidence in the record that Plaintiff's workday would be subject to the disruption caused by an <u>unscheduled</u> breathing treatment, i.e., one, as the ALJ stated, which would occur out of a normal break time [Tr. 246]. In fact, the most recent list of medications submitted during the hearing [Tr. 3 and 167] is inconsistent

with Plaintiff's argument that she needed an <u>unscheduled</u> or <u>as needed</u> nebulizer treatment during the day.  In that document she states that the two solutions used in her nebulizer – Albuterol and Atrovent (ipratropium bromide), *see* Doc. No. 14, page 7 – are to be used three times a day.  For use <u>as needed</u>, she also listed "Albuterol inhalers 2 puff as needed." [Tr. 167].  The ALJ's RFC assessment is supported by substantial evidence in the record, and his decision should be affirmed.

## RECOMMENDATION

For the foregoing reasons, it is recommended that this matter be affirmed. The parties are advised of their right to object to this Report and Recommendation by August 23, 2005, in accordance with 28 U.S.C. §636 and Local Civil Rule 72.1.  The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).  This Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 3rd day of August, 2005.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE